**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**AFFIDAVIT IN SUPPORT OF SEIZURE WARRANT**

I, Ryan Eggland, ("your Affiant"), being duly sworn, depose and state as follows:

1.       I am a Special Agent ("SA") of the Internal Revenue Service Criminal

Investigation Division ("IRS-CI"), and have been so employed for approximately six and one

half years.  I am currently assigned to the Orlando Field Office.  Among my duties as an SA, I

am charged with the investigation of money laundering and its predicate offenses, violations of

currency/money transmission reporting and registration requirements, and violations of United

States Tax Code.  Prior to my employment with the IRS-CI, I was employed by Merrill Lynch

Credit Corporation for approximately three years.  My last assignment was that of an underwriter

of residential and small commercial mortgages.  Among my duties as an underwriter, I

performed extensive income and credit investigations and analysis including that of high net

worth clients that exhibit complex financial pictures.  I obtained a Master's Degree of Business

Administration from the University of North Florida in May 2000.

2.       This investigation is being conducted jointly by the United States Secret Service

and the Internal Revenue Service.  Information obtained as a result of the investigative efforts of

each agency are being shared with agents from the other agency and have been incorporated into

this affidavit.  The facts set forth in this affidavit are based on my own personal knowledge;

knowledge obtained from other law enforcement officers; review of documents and computer

records related to this investigation; communications with others who have personal knowledge

of the events and circumstances described herein; and information gained through my training

and experience and the training and experience of others.

1

3.      This affidavit is being submitted in support of an application for a seizure

warrant, based upon 18 U.S.C. § 981(a)(1)(A) and (a)(1)(C), for the property in the e-gold

accounts listed below.  The e-gold accounts listed below contain property involved in laundering

the proceeds of wire (investment) fraud or internet gambling.  All of these accounts contain the

digital currency "e-gold" that is allocated and transferred among accounts by e-gold, Ltd.  e-

gold, Ltd., along with Gold & Silver Reserve, Inc., Douglas Jackson, Barry Downey and Reid

Jackson (collectively "the e-gold operation"), are defendants in United States v. e-gold, Ltd., et

al., Crim Case No. 07-109 and entered pleas of guilty to money laundering and/or money

transmitting violations on July 21, 2008 in this Court.  The physical precious metals that are

"backing" the e-gold are controlled by the e-gold operation.  The specific property includes the

following e-gold accounts:

| Account Name | e-gold Account Number |
|---|---|
| Sovereign Management | 340609, 1332408 |
| Open Bruce | 5254347, 5255429, 5454991, 5455005, 5455369, 5455386, 5251486, 3628018 |
| Club Freedom | 4433390, 4575429, 4856092, 4874219 |
| World Pension Plus | 4871774, 2328039, 2841206 |
| Foreign Fund | 897312 |
| 5Dimes | 2043340 |

4.      Based upon the evidence uncovered, there is probable cause to believe that the

property contained in the above- identified e-gold accounts is involved in money laundering in

violation of Title 18, United States Code, Section 1956, and is therefore subject to seizure and forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) and (a)(1)(C), or, in some cases, are identical property found in the same place or account, within one year, as the property involved in the offense giving rise to forfeiture, and therefore subject to seizure for forfeiture as provided by 18 U.S.C. § 984(a)(2).  Specifically, the property contained in the e-gold accounts listed above represents either already-laundered criminal proceeds or property used to conceal the nature, location, source, ownership, or control of the criminal proceeds.

5.     The transactions occurring in, and the total value of, the accounts described in this Affidavit for seizure are presented in approximation below in both ounces of gold and U.S. dollars to reflect the way in which the owners and operators of the e-gold system record the transactions occurring in the e-gold accounts in their databases, as discussed more fully below. To obtain the value subject to seizure in these accounts pursuant to the requested seizure warrant, it will be necessary to require e-gold, Ltd. and/or Gold & Silver Reserve, Inc. to convert the "e-gold" in the accounts specified to United States dollars before turning the property over to the United States.  Otherwise, the property in the accounts will remain as e-gold and thus entirely under the control of e-gold, Ltd. and Gold & Silver Reserve, Inc. (defendants in the related criminal case), could be easily dissipated, and would be essentially without value should e-gold, Ltd. and/or Gold & Silver Reserve, Inc., and/or other exchangers decide not to provide exchange services.

6.     Because this affidavit is being submitted for the limited purposes of establishing probable cause, I have not included every detail of every aspect of the investigation for this affidavit.  Rather, it only includes the information necessary to prove that probable cause exists

3

for a seizure warrant to be issued for property that was involved in money laundering in violation of Title 18, United States Code, Section 1956.

### ***Background on Digital Currency Issuers and Exchangers***

7.      A "digital currency" is a medium of exchange offered over the Internet that is purportedly backed by precious metals and offers users another option for conducting on-line funds transfers.  Digital currencies are generally marketed as offering global acceptance without the need for conversion between national currencies, and are valued at fluctuating rates tied to the price of a particular precious metal, especially gold.  Digital currency is used for on-line commerce or for funds transfers between individuals for private purposes.  While technically speaking, the owner of digital currency could have some right to acquire the actual metal behind the currency, digital currency users typically convert their value into a national currency when they want to take value out of the on-line system.

8.      One of the earliest issuers of digital currency was e-gold, Ltd. ("e-gold"), which operates via the Internet using the domain name http://www.e-gold.com, and began offering the digital currency "e-gold" in 1996.  e-gold appears as the most popular and prominent digital currency available on-line.  e-gold is widely accepted as a payment mechanism for transactions involving credit card and identification fraud, high yield investment programs and other investment scams, off-shore internet gambling and child exploitation.  e-gold is not widely accepted by large or mainstream vendors.

9.     There are four primary steps involved in a financial transaction using e-gold:  (i) opening a digital currency account with e-gold; (ii) converting national currency into e-gold to fund the account; (iii) using e-gold to buy or sell a good or service or transfer funds to another person; and (iv) exchanging the e-gold back into national currency.  e-gold needs two additional parties to complete these steps: (i) digital currency exchangers; and (ii) merchants or individuals that are willing to accept e-gold for the payment of goods and services or to use the e-gold operation to transfer funds.

10.     Digital currency exchangers take national currency from customers and exchange it into e-gold for purposes of funding a new e-gold account, or increasing the value of an existing account.

11.     Exchangers also exchange e-gold back into national currency and are typically the only method by which users can obtain the value out of an e-gold account, short of taking possession of the precious metal itself, which is not always possible and practically never done. Each exchanger set its own terms and conditions on the types and amounts of national currency that it accepts for exchange.  Some only accept transfers from banks or credit card accounts. Others accept cash and money orders.  Most exchangers (including all of the domestic exchangers investigated) operate out of their home by using an Internet website to service customers, bank accounts for accepting cash and other deposits, and post office boxes for receipt of checks and other mailings.

12.     The exchangers are an integral part of the e-gold operation.  Some of these exchangers are sponsored by e-gold on its website and receive discounted rates for the e-gold they purchase to operate their businesses.  While, generally, these exchangers also convert

national currency to other online digital currencies, e-gold is the most prominent and extensively-used digital currency.

13.     Individuals using digital currency exchangers typically incur fees on a per transaction basis.  Fees/percentages incurred per transaction depend largely on the exchanger used.  In some instances, the exchanger would charge up to 6% of the amount of funds transferred.  These fees assessed by the exchanger are referred to as "service fees."

14.     Users around the world can register for a free e-gold account via the e-gold website and fund their account through a third party digital currency exchanger or through e-gold's own exchange service, which it called "OmniPay."  Once open and funded, account holders can access their accounts through the Internet and conduct transactions with other parties anywhere in the world.  e-gold advertised on its website that it is "an alternative Internet payment system" that "empowers people to use gold as money."  e-gold advertises its service as "Better Money," and "Internet Payments 100% backed by Gold."

15.     The digital currency e-gold can be traded among online account holders using the Internet.  With only a valid e-mail address, each account holder is issued an e-gold account, which can be used to send and receive any amount of e-gold to/from other e-gold account holders anywhere in the world anonymously, instantaneously, and irreversibly.  e-gold, in combination with other unregistered money service businesses, has become a preferred funds transfer mechanism for a multitude of criminal financial transactions.

### *The e-gold Operation*

16.     The e-gold operation consists of two entities, e-gold, Ltd. ("e-gold") and Gold & Silver Reserve, Inc. ("GSR"), and three individuals, Douglas Jackson, Barry Downey, and Reid

Jackson (collectively the "e-gold operation"). As described above, e-gold is the issuer of the digital currency known as "e-gold," which functions as an alternative payment system, is purportedly backed by stored physical gold, and operates via the Internet using the domain name http://www.e-gold.com. GSR describes itself as the operator of e-gold and its respective website, and offers a digital currency exchange service (known as OmniPay) for individuals wishing to purchase, transfer, and/or sell e-gold. OmniPay operated via the Internet using the domain name http://www.omnipay.com. While e-gold was incorporated in Nevis, the e-gold operation is located entirely in Florida, including its physical business location at 175 E. Nasa Blvd., Suite 300, Melbourne, Florida (including management, employees, and records) and computer servers that conduct its on-line operations. All e-gold transactions take place through the e-gold server and database located in Florida. All e-gold accounts and balances are maintained there as well. The e-gold operation's owners/operators include Douglas Jackson, Barry Downey, and Reid Jackson.

17.     <u>Ownership of e-gold</u>. According to the e-gold website, the gold bullion allegedly backing the digital currency e-gold is physically held in allocated storage in overseas vaults by three repositories (*i.e.*, custodians) on behalf of the e-gold Bullion Reserve Special Purpose Trust. Also according to the e-gold website, the e-gold Bullion Reserve Special Purpose Trust was established for holding title for the gold collectively on behalf of the e-gold account holders. The e-gold Account User Agreement provides that an "e-metal balance is accounted by weight and constitutes title to that precise fine weight of metal." As such, the beneficiaries of the e-gold Bullion Reserve Special Purpose Trust are purportedly the account holders of e-gold accounts (collectively) and e-gold account holders purportedly hold title to the "precise fine weight of

metal" backing the amount of e-gold in their account.  However, the account holders right to

claim the physical gold in exchange for their e-gold is severely circumscribed by the user

agreement's conditional right of redemption, which provides, among other things, that the

minimum quantity for redemption would "in no case ... be less than the fine weight of the

smallest bullion items held in storage."  According to the e-gold website, e-gold's lowest ounce

bar is a 32 ounce bar, worth approximately $21,248.  As a result, at a minimum, an account

holder can only exchange $21,248 worth of e-gold in order to take physical possession of the

gold.  Finally, the e-gold website also provides that "[N]o metal may be removed from storage or

any other disposition made without the signatures of both e-gold Ltd. and a third party Escrow

Agent of good reputation."  This further conditions an e-gold account holder's ability to obtain

physical possession of any gold.

### *Examination of e-gold Customer Account Database*

18.     Search warrants were conducted on the business location of the e-gold operation

as well as the location of the operation's computer servers in December of 2005.  Approximately

three terabytes of digital evidence (three quadrillion characters of information) and 100 boxes of

documentary evidence (approximately 288,000 pages) were seized.

19.     Evidence regarding the transactions and account activity of e-gold account

holders and its customers was obtained through examination the e-gold operation's computer

databases.  The e-gold operation maintains Microsoft SQL server databases housing customer

profiles and transaction histories of e-gold account holders, as well as OmniPay customers.

Your Affiant obtained copies of these databases by imaging servers located at AT&T in Orlando,

Florida[1] and seizing back-up tapes at the Melbourne offices of the e-gold operation pursuant to a December 16, 2005 search warrant issued by a Magistrate Judge in Orlando, Florida.  The e-gold operation also provided an additional update of the database information (by copying the database to hard drives) for the period of November 2005 through October 2006 in response to grand jury subpoenas issued on May 22, 2006 and October 25, 2006.  The e-gold operation provided a second update of the database information (by copying the database to an external hard drive) for the period of October 2006 through March 2007 in response to a grand jury subpoena issued on March 6, 2007.

20.     A further update of the database was provided by the e-gold operation in response to a Pre-Indictment Restraining Order issued by this Court on April 25, 2007.  The e-gold operation provided the latest update of the database information (by copying the database to an external hard drive) for the period of March 15, 2008 through July 15, 2008 pursuant to terms of the plea agreement entered into on July 21, 2008.

21.     From these images of the servers and copies of the databases, I was able to reconstruct the customer profiles and transaction histories for e-gold account holders by transferring the database information on each account holder into a Microsoft Excel spreadsheet.  The following specific information was available for each e-gold account:

>    a.    Customer profile:  point of contact ("POC") information for the e-gold account holder, including account name, mailing address, and email address supplied by the customer.

---

[1] Both the e-gold and OmniPay websites and corresponding customer databases are run from servers co-located at AT&T in Orlando, Florida, approximately 100 miles from GSR's physical business location in Melbourne, Florida.

b.      Transaction history:  list of transactions demonstrating e-gold being transferred into and out of the account.  For each transaction, the history contains, among other things, the date of the transaction, the type of transaction (e.g., whether e-gold is being transferred into or out of the account), the e-gold account number of the other party to the transaction (also known as the "counteraccount"), the amount of the transaction, the Internet Protocol ("IP") address of the transferor of e-gold, and a place for the customer to make a notation about the purpose of the transaction (also known as the "memo" field).

c.      Value limits: The e-gold operation had a policy of placing a "value-limits" on accounts that it believed to be engaged in criminal activity or where bogus contact information had been entered by the account holder.  An account holder with a "value limit" placed on his or her account was restricted from receiving any further e-gold into his or her account, although he or she continued to be free to spend or transfer any e-gold out of his or her account.  When a "value-limit" was placed on an account, a notation of the basis for the "value-limit" (such as for "child porn," "scammer," "hyip susp," or "cc fraud") was entered in the user's account profile in the e-gold database and would appear, along with the date the value limit was placed, in the transaction history information.

22.    From these images of the servers and copies of the databases I was able to create a spreadsheet of accounts and perform various searches of the database, including, for example:

a.   Searches for particular terms used in the "memo" fields in the customer transaction histories, such as "HYIP" to indicate that "e-gold" was being used for criminal purposes.

b.   Searches for particular e-mail addresses of known criminals or criminal entities that may have been used to create an e-gold account.

c.   Searches for particular names or nicknames of known criminals or criminal entities that may have been used to create an e-gold account.

d.   Searches for notations of the basis for the e-gold operation placing "value-limits" on particular accounts, such as for "scammer, or "susp hyip".

<u>Background on Pyramid Schemes</u>

23.   e-gold has been a highly-favored method of payment by operators of investment scams, which generally refers to pyramids, ponzis, HYIPs (*i.e.*, high-yield investment programs) and other "get-rich-quick"schemes.  During the course of this investigation, I consulted with an Economist at the Federal Trade Commission ("FTC") who explained that a pyramid (or ponzi or HYIP) scheme is an organization in which the participants obtain their monetary benefits primarily from the recruitment of newer participants, rather than from the sale of goods and/or services to the general public.  Because of this, the overwhelming majority of the participants cannot expect to make any money from their participation.  A small minority of participants, namely those who participate at the very beginning, might make money.  However, because of the nature of the pyramid scheme, those who make any money must of necessity be only a small minority of all participants.

24.     The FTC Economist further explained that growth of the system does not change the fact that the large majority of participants at any point in time will have lost money.  An individual participant might go from having a net loss to a net profit as the system grows, but it must be true that the majority of participants will lose money.  The system cannot grow indefinitely, if for no other reason than the fact that growth is limited by the finite human population of the earth.  Long before this point is reached though, the number of people willing to pay to sign on as new participants will become fewer and fewer.  At this point, no further growth is possible, and the scheme will collapse.  When that happens, the majority of the participants will have lost money.

25.     The FTC Economist further explained that these scams typically have one of several indicators or "markings," including (i) the promise of abnormally high short-term returns on investments; (ii) the absence of any legitimate or reasonable business investment; and (iii), as described above, only a small minority of individuals can profit from the operation of the business.

26.     According to Omar Dhanani, an individual convicted of access device fraud in the above-described Shadowcrew prosecution, who also used e-gold to participate in pyramid schemes, e-gold has been favored in this area particularly because of a user's ability to operate accounts anonymously, and e-gold's policy of making all transfers of e-gold irrevocable and not subject to reversal.

27.     A search of the e-gold database in 2007 revealed over 11, 000 e-gold accounts that have been opened using the term "hyip" in either the account-owner's name or e-mail address, or where "hyip" appears in the "memo" field of the transaction record.

Patterns of Investment Scams using e-gold

28.     This investigation uncovered numerous promoters (or operators) of pyramid, HYIP, and other similar schemes, each of whom operated several different investment scams and laundered their proceeds through chains of interconnected e-gold accounts.  Several patterns emerged with regard to the transaction activity within accounts operated by these promoters. First, the promoters would set up an e-gold account to which all investors would send deposits to the program.  From this main account, the promoters would pay out three types of "returns": (1) payouts to a majority of investors in amounts much smaller than the investors' initial deposits in order that these investors would keep believing this was a worthwhile "investment"; (2) payouts to a select group of investors in amounts far exceeding their initial investment in order that these investors could continue to promote the scheme on the internet as actually paying out the "promised return"; and (3) transfers to e-gold accounts controlled by the same promoter in large amounts representing the profits of the scam (*i.e.*, the stealing of investors' money).

29.     The promoters of the large pyramid (or HYIP) schemes appeared to often coordinate their activity informally by investing in, and thereby promoting, the other promoters' programs.  This informal coordination allows the promoters to ensure that they will become the select group of investors receiving the "promised return" from any given scam.  Such investments in other large HYIP programs also enables promoters to mask their profits from the original scam by layering the scammed funds through many different e-gold accounts.  Once filtered through several layers of transactions and accounts, HYIP promoters typically store their funds in a holding account, waiting for the opportunity to exchange the funds into national currency.

30.     Because most of the High Yield Investment Scams are promoted, operated, and maintained on the Internet, most of the communication among the operators and participants is conducted within on-line virtual discussion groups.  Discussion groups (also called "blogs" or "forums") are places for individuals to place a "post" on a web board for others to read and to reply to.  http://www.TalkGold.com, http://www.HYIPdiscussion.com, and other discussion boards provide information outlining the programs that are currently operating and other pyramid schemes that have collapsed on themselves.  Most of the individual posts to the boards are from those who invest in the pyramid schemes and those who operate and promote the illegal investment scams.

<u>Pyramid Terms in "Memo" Fields</u>

31.     This investigation also revealed that e-gold accounts involved in the operation of pyramid schemes and HYIPs use certain terms in the memo fields of transaction records that identify a particular scheme in progress.  Such terms include "%gains," "refund," "payout," "units," "loans," "contracts," and "compounding."  Use of these terms is indicative of deposits to, and payouts from, a pyramid scheme or HYIP.

<u>Variations on Traditional Pyramid Schemes</u>

32.     "Paid-to-Surf" (or "Auto-Surfing") investment schemes are a variation on the typical high yield investment scheme.  Paid-to-surf programs claim to be a form of online advertising that generates revenues from companies that want to increase internet traffic or "hits" to their website.  Investors are led to believe that companies operating legitimate websites hire a paid-to-surf firm to generate internet traffic, which, in turn, pays individual web surfers to view certain websites on an automatically rotating basis.  The claim is that the more sites the

14

individual visits, the more money he or she stands to earn.  In reality, most paid to surf programs operate like a traditional pyramid scheme by paying investor interest with deposits from new investors.

33.     Another type of fraudulent investment scheme is the reverse pension plan.  Like traditional pyramid schemes and "paid-to-surf" programs, investors are generally promised payouts, usually in amounts ranging from $50,000 to more than $100,000, for an initial fee of $35 to $50.  The reverse pension plan purportedly operates through a third-party or financial institution who purchases an insurance policy on your behalf.  The investor, in return, signs over this policy to the third-party to collect when the investor retires.  The third-party allegedly pays investors, upfront, a lump sum or percentage of the total payout that he or she would receive would have received when the investment matured in the future.  Like a pyramid scheme, fraudulent reverse pension plans pay commissions to current investors for bringing in new investors.  However, in reality, fraudulent reverse pension plans operate like a traditional pyramid scheme by paying investor commissions with deposits from new investors, and never invest in anything.

<u>Patterns of Off-shore Gaming Websites using e-gold</u>

34.     In recent years, the e-gold system has also been a favored method of payment for off-shore illegal gambling websites.  Illicit off-shore internet gambling may implicate as many as seven federal criminal statutes.  It is a federal crime (1) to conduct an illegal gambling business, 18 U.S.C. § 1955; (2) to use the telephone or telecommunications to conduct an illegal gambling business, 18 U.S.C. § 1084; (3) to use the facilities of interstate commerce to conduct an illegal gambling business, 18 U.S.C. § 1952; (4) to conduct the activities of an illegal gambling

business involving either the collection of an unlawful debt or a pattern of gambling offenses, 18

U.S.C. § 1962; (5) to launder the proceeds from an illegal gambling business, 18 U.S.C. § 1956;

(6) to spend more than $10,000 of the proceeds from an illegal gambling operation at any one

time and place, 18 U.S.C. § 1957; and (7) under the Unlawful Internet Gambling Enforcement

Act (UIEGA), P.L. 109-347 (2006), for a gambling business to accept payment for illegal

Internet gambling, 31 U.S.C. § 5361-5367.

35.    Since enactment of the UIEGA, e-gold, Ltd. has deployed a feature whereby any

e-gold account holder may configure their e-gold accounts to block incoming e-gold payments

from accounts controlled by users residing inside the United States or who are accessing the

internet from within the United States.  However, the feature must be enabled by those operating

the e-gold accounts associated with off-shore internet gambling websites. Account analysis

indicates that operators of off-shore internet gambling websites continue to accept payments

from, and send credits to, accounts controlled by users residing inside the United States or who

are accessing the internet from within the United States.  Account analysis also suggests that

many of these sites may also be operating within the United States.

Identified e-gold accounts operating pyramid schemes and off-shore gambling websites

36.    For each of the pyramid schemes described below there is a flowchart depicting

the flow of funds through the accounts involved in the scheme, attached as Exhibit 1.


**Sovereign Management Services, S.A.**
**e-gold account numbers 340609 and 1332408**

37.    e-gold account numbers 340609 and 1332408 are held in the names of related

entities:  Sovereign Management Services S.A. and S.C.I.B., respectively.  The "Account POC"

names are David Johnston and Duncan Johnston, which suggests the accounts are held by the same or related individuals. Both accounts have the primary "Account POC" e-mail listed as mail@scibank.com. In addition, the street address listed for both accounts is "Ricardo J Alfaro Avenue, Century Tower Building, 20th floor, Suite 2007, Panama City, Panama". This address is known to law enforcement as an address used by other fraudulent high yield investment schemes and illegal off-shore tax shelter companies operating via the internet. The similar e-mail address, account names, account addresses, account activity and notations in the transaction memo fields of both accounts, suggest that 340609 and 1332408 are associated with an off-shore entity or group of entities known as Sovereign Management Services, S.A. (SMS). The funds held in these accounts are proceeds of fraudulent high-yield investment schemes or are involved in laundering the proceeds of fraudulent high-yield investment schemes.

38.     SMS continues to operate on the Internet at http://www.offshore-protection.com/ and, according to the website, the company offers asset protection, privacy, tax reduction, and other services relating to concealing financial assets. The website indicates that SMS is physically located in Panama so that it can take advantage of a "full fledged tax haven" and its "strict privacy laws." SMS offers customers the ability to set up a company that appears to be established offshore, as well as services such as mail forwarding, telephone answering, hosting servers, opening offshore bank accounts, and other virtual office services that present the false appearance that an entity or business exists offshore. The company also prepares foreign debt instruments to give the false appearance that funds came from or are encumbered by fictitious sources. The services offered by SMS are designed primarily to support illegal conduct and

facilitate the illegal concealment of taxable assets.  The transaction memo fields, with notations

such as "From Fredrik Bennerhag for 2 Panama companies", are evidence of such activity.

  39. SMS account activity ceased in May of 2007 when indictments were returned

against the operators of the e-gold system.  At that time, it appears that SMS moved e-gold funds

to Moneygram (another digital currency offering anonymity to its customers) and likely began

directing new funds there rather than receiving them through e-gold.  However, some funds from

illegal sources remain in e-gold account numbers 340609 and 1332408.  The large majority of

the e-gold remaining in these accounts originated from high yield investment schemes or are

funds involved in the laundering of proceeds of high yield investment schemes, including e-gold

accounts 2592975 and 19222185 (Sime Securities / B-Connected), e-gold account 2291364

(Kum Holdings), and e-gold account 2349119 (Solid Investment).  Any remaining funds, to the

extent they are not criminal themselves, served to conceal the nature of those high yield

investment program proceeds.

  40. **Sime Securities** -- e-gold account numbers 2592975 and 1922189 are operated by

Sime Securities, with an account name of "B-Connected Technology Inc", a "Account POC" of

"Nor Hisham Hashim" and an account address in Malaysia.  e-gold accounts held by Sime

Securities have previously been identified and seized by the government, for operating as a

fraudulent high yield investment scheme, pursuant to a Search Warrant from this Court on April

25, 2007.

  41. Sime Securities operated via the internet at http://simesecurities.net.  An archived

version of the site obtained via WayBackMachine at http://www.archive.org, indicates that the

Sime Securities HYIP investment scam began in August 2004.  The website advertised that they

were operated by "a group of professional advisors and investment consultants backed up by

Online Forex Trading, CFD Trading, Commodities and investing in various funds and

activities." Depending on how much money an individual "invested" with Sime Securities, the

website guaranteed returns of 1.5%-2.5% daily, 15%-25% weekly or 140%-280% monthly.

Transactions show that the HYIP investment scam ended in October 2005. On August 9, 2005

Simesecurities.net "put on hold all withdrawal request until August 18, 2005."  e-gold placed a

limit on Sime Securities e-gold account number 805405.  The limit prevented any transfers of

funds into the account, but some of the funds were transferred into another account operated by

the same operators of the limited account.

     42.     e-gold account number 1922189 made eight payments for a total of 324.380689

ounces (approximately $162,646.50) of e-gold to SMS from October 31, 2005 to January 4,

2006.

     43.     e-gold account number 2592975 made seven payments to SMS for a total of

291.604275 ounces (approximately $149,537.00) of e-gold from November 18, 2005 to January

4, 2006.

     44.     **Kum Holdings** – e-gold account number 2291364 is an operating account for

Kum Holdings with an "Account POC" of  "Christopher Trine."  Kum Holdings was a fraudulent

high yield investment scheme operating on the internet at http://www.kum-holdings.com that

began operating in July 2005.  According to internet blogs and forums discussing Kum Holdings

investors were required to make a minimum investment amount of $5,000.  The scheme

guaranteed 10% weekly returns.  Based on account activity, it appears that returns were paid to

initial investors out of the funds of later investors.  The scam appears to have stopped paying

returns in January 2006.  The Kum Holdings e-gold account number 2291364 made four payments to SMS account number 340609 for a total of 59.620918 ounces (approximately $38,000.00) from December 29, 2006 to January 2, 2007.

45.    **Solid Investment** -- Solid Investment is an investment scheme, which began operation in about October 2005 using the website http://www.SolidInvestment.com.  The operators of Solid Investments advertized daily returns from 1.8% to 3%.  They claimed to be able to attain these unrealistic returns through bank debentures, hedge funds and private placements.  Analysis of the e-gold accounts used to operate the scheme does not show any funds going to bank debentures, hedge funds, or private placements.  Nor does it appear that any returns from such investments were received in Solid Investments accounts.  Rather, funds that appear to be received from investors are used to pay withdrawals of other investors.

46.    On June 13, 2006, a civil lawsuit was filed in the in the Court of Common Pleas of Allegheny County, Pennsylvania on behalf of Michael Dougal against twelve other e-gold accounts purportedly held in the name of Solid Investment with "Account POCs" listed as "Alex Polyakov" and "Sam Collins".  On August 8, 2006, the Court issued a default judgment against the accounts in the amount of $44,763,122.24 after the defendants failed to appear.

47.    Solid Investment e-gold account number 2349119 made 18 payments to SMS e-gold account number 340609 from February 9, 2006 to March 1, 2006 for a total of 502.132966 ounces (approximately $278,552.00) of e-gold.  Immediately prior to these payments, there are deposits into this account with memo field notations that reference "SolidInvestment.com Withdrawal."  These funds represent the proceeds of the Solid Investment high yield investment scheme.

48.     As of July 7, 2008, the total value of e-gold remaining in SMS account number

340609 is 256.904198 ounces (approximately $219,293.42) of e-gold.  The total value of e-gold

remaining in SMS account number 133240 is 240.960997 ounces (approximately $205,643.31)

of e-gold.  The total amount, 497.76937 ounces (approximately $424,936.73) of e-gold,

represents the proceeds of fraudulent high-yield investment schemes or funds involved in the

laundering of proceeds of fraudulent high-yield investment schemes.

**OpenBruce**
**e-gold accounts  3628018, 5454991,**
**5455005, 5455369, 5455386,**
**5254347, 5255429, 5251486**

49.     OpenBruce was an investment scheme that was operated on the internet at

http://www.openbruce.biz.  The website is no longer operational.  However, historical internet

research of the archived website via WayBackMachine at http://www.archive.org reveals that an

unidentified individual operated the investment scheme and the business was reportedly

registered in the Bahamas.  Participants in the investment scheme could invest between $10 and

$200 million.  The company advertised to be expert in the foreign exchange market and was

promising returns of 5-10% per week.  OpenBruce also offered its participants a 10% bonus on

the amount of money that was invested by new participants they referred.

50.     Direct tracing of the origin of the funds involved in the OpenBruce scheme has

proven to be highly complex and inordinately time consuming.  However, analysis of the

OpenBruce scheme reveals patterns of activity similar to those seen in prior investigation of

large HYIP schemes operating through e-gold, Ltd.  At least one other scheme operating through

e-gold, for example, used over six hundred different accounts to layer its transactions and make

the linear tracing of assets virtually impossible.  Consistent with these other schemes, the

OpenBruce scheme appears to utilize currency exchangers, or what purport to be currency exchangers, to receive investor deposits, which are later funneled into accounts controlled by the operators of the OpenBruce scheme.  Previous investigations have revealed that these so-called currency exchangers may also themselves be HYIP owners' accounts, disguised as currency exchangers.  The investigation into the e-gold system has consistently associated this sort of activity, as well as that of OpenBruce, with illegal HYIP schemes.  No other classification of e-gold account exhibits this type of activity with this volume through so many holder-accounts. There is no known legitimate purpose (business or personal) for moving funds in such an exhaustive and complex manner.

**Account number 3628018**

51.    The OpenBruce scheme was operated using multiple accounts to launder the proceeds of its high-yield investment scheme.  Analysis of e-gold account numbers 3628018, 3366586, 5320806, and 5303516 indicates that these are the four main OpenBruce accounts that received funds from numerous other accounts where the fraud proceeds were generated.  These accounts all have a common link through one or more of the following attributes: account names of "openbruce" and "op4215," or "Account POCs" of "liujunyi," "liu junyi" or "yjwcwyq," or an account e-mail of op4215@yahoo.com.  Not only do these accounts have common account attributes, but they also received incoming funds from e-gold account number 5242047, which has an "Account POC" email contact of openbruce@gmail.com.  Analysis of account number 5242047 reveals large sums of e-gold being received from what purport to be currency exchangers.  e-gold accounts 3628018, 3366586, 5320806, and 5303516 were value-limited by e-gold Ltd. between April 18, 2008 and June 18, 2008, for "False ID-LR," "Exchange fraud-dj,"

and "susp hyip."  As of July 16, 2008, e-gold account number 3628018 maintained a balance of

40.8579 ounces (approximately $34,876.31) of e-gold, while account numbers 3366586,

5320806, and 5303516 no longer maintain an account balance.

52.     The four primary OpenBruce accounts described above were the main funding

source for seven additional e-gold accounts also involved in the OpenBruce scheme: e-gold

account numbers 3761531, 3902365, 3901895, 3338281, 3786096, 5370525, and 5321996.

These seven accounts share one or more common account attributes with the primary OpenBruce

accounts and with one another.  Common account attributes include: account names of

"openbruce" or "mnbn," "Account POC" names of "liu junyi," "Liu Even," and "yjwcwyq," and

account email addresses of "kcn168@163.com," as well as other 163.com email addresses with

"kcn" prefixes.  The email server 163.com is known to law enforcement to be used by many

individuals who operate high yield investment schemes in China.

53.     On June 18, 2008, an e-gold administrator placed value limits on account

numbers 3761531, 3902365, 3901895, 3338281, 3786096, 5370525, and 5321996 for "susp

hyip," indicating that they were identified by e-gold, Ltd. as accounts used to operate a

fraudulent high yield investment scheme.  On that same day, the operators of the investment

scheme moved 1516.5066 ounces (approximately $1,352,888.00) of e-gold from the seven

accounts above into account number 2033031 with an account name of "CROWN" and an

"Account POC" name of "Xiaoqing Lai."  Within a few minutes of moving that large amount of

e-gold into account number 2033031, the operators of the investment scheme created new e-gold

account numbers 5454880 and 5454693 and moved similar amounts of e-gold, in separate

transactions, into those accounts.  After moving the funds into these newly created accounts, the

operators then transferred the funds into other new accounts: e-gold account numbers 5454991,

5455369, 5455005, and 5455386.  On the same day, the operators of the investment scheme also

moved e-gold from account number 2033031 into other existing e-gold accounts: e-gold account

numbers 5254347 and 5255529.  Account number 5255529 further transferred e-gold to account

number 5255429.  These transfers served to further launder the proceeds of the investment

scheme and to conceal the source of the funds.  e-gold account numbers 5455369, 5455005,

5455386, 5454991, 5254347, and 5255429 are still balance-holding accounts that contain

approximately $1,299,886.16 combined.

**Account number 5454991**

54.      On June 18, 2008, account number 2033031 transferred 738.729 ounces of gold

(approximately $658,873.00) into e-gold account number 5454880, with an account name of

"yu88," created on June 18, 2008.  The "Account POC" information of this account lists an

email address of mnbn61@163.com.  Minutes after receiving the funds from account number

2033031, the operator of account number 545880 transferred 80.594 ounces (approximately

$71,882.00) of e-gold into newly created account number 5454991, with an account name of

"yy9618."  This account was created on June 18, 2008, and the "Account POC" information of

this account lists an email address of mnbn62@163.com and the "Account POC" name is "liu

jun yi."  Upon review of account number 5454991, it was discovered that account number

5454693, with an account name of "zxcx" also transferred 56.078 ounces (approximately

$49,999.00) of e-gold into account number 5454991.  The "Account POC" information for

account number 5454693 lists an email address of y9618@163.com.  This account was also

created on June 18, 2008.  As of July 16, 2008, account number 5454991 contained 145.4069

ounces (approximately $124,119.33) of e-gold.  This amount represents the proceeds of a high

yield investment scheme.

**Account number 5455005**

55.     On June 18, 2008, account number 5454880, with an account name of "yu88"

transferred 323.657 ounces (approximately $288,670.00) of e-gold into account number

5455005, with an account name of "yy888," created on June 18, 2008.  The "Account POC"

information for account number 5455005 indicates the email address for the account holder is

mnbn63@163.com and the "Account POC" name is "liu jun yl."  This account received the

funds and then remained dormant.  As of July 16, 2008, the remaining account number 5455005

contained 323.5106 ounces (approximately $276,148.72) of e-gold.  This amount represents the

proceeds of a high yield investment scheme and/or funds involved in money laundering.

**Account number 5455369**

56.     On June 18, 2008, account number 5454880 transferred 334.4702 ounces

(approximately $298,314.00) of e-gold into account number 5455369, with an account name of

"zzbn66," created on June 18, 2008.  The "Account POC" information for this account indicates

the email address for the account holder is mnbn66@163.com and the "Account POC" name is

"liu jun yl."  As of July 16, 2008, account number 5455369 contained 332.7130 ounces

(approximately $284,033.88) of e-gold.  This amount represents the proceeds of a high yield

investment scheme and/or funds involved in money laundering.

**Account number 5455386**

57.     On June 18, 2008, account number 2033031 transferred 508.0244 ounces

(approximately $453,107.00) of e-gold into account number 5454693, with an account name of

"zxcx," created on June 18, 2008.  One minute after this transfer the operator then transferred 508.0222 ounces (approximately $453,105.00) into account number 5455386, with an account name of "e-g001," created on June 18, 2008.  The "Account POC" information for this account indicates the email address for the account holder is mnbn67@163.com and the "Account POC" name is "liu jun yi."  As of July 16, 2008, account number 5455386 contained 507.7938 ounces of (approximately $433,452.83) of e-gold.  This amount represents the proceeds of a high yield investment scheme and/or funds involved in money laundering.

**Account number 5254347**

58.      On June 18, 2008, account number 2033031 transferred 126.914727 ounces (approximately $113,411.00) of e-gold into account number 5254347 with an account name of "JOHN JACK."  Account number 5255529 was created on March 7, 2008, but had no preexisting balance.  The "Account POC" information for this account indicates the email address for the account holder is johnjackmy@gmail.com and the "Account POC" name is "JOHN JACK."  As of July 16, 2008, account number 5254347 contained 121.821078 ounces (approximately $103,968.47) of e-gold.  This amount represents the proceeds of a high yield investment scheme and/or funds involved in money laundering.

**Account number 5255429**

59.      On June 18, 2008, account number 2033031 transferred 122.28385 ounces (approximately $109,152.00) of e-gold into account number 5255529, with an account name of "JOHN JACK."  Account number 5255529 was created on March 7, 2008, but had no preexisting balance.  The "Account POC" information for this account indicates the email address for the account holder is johnjackmy@gmail.com and the "Account POC" name is

"JOHN JACK."   Immediately after receiving this transfer, the operator of account number

5255529 then transferred 122.283218 ounces (approximately $109,150.00) of e-gold into

account number 5255429, with an account name of "soos" created on March 7, 2008.  This

account had no preexisting balance.  The "Account POC" information for account number

5255429 indicates the email address for the account holder is johnjackmy@gmail.com and the

"Account POC" name is "JOHN JACK."  As of July 16, 2008, account number 5255429

contained 91.56857 ounces (approximately $78,162.93) of e-gold.  This amount represents the

proceeds of proceeds of a high yield investment scheme and/or funds involved in money

laundering.

**Account number 5251486**

60.      In addition to the "JOHN JACK" e-gold accounts that received incoming transfers

from account number 2033031 on June 18, 2008, e-gold account number 5251486 received

206.039 ounces (approximately $187,846.00) of e-gold on June 26, 2008.  Account number

5251486 was created on March 6, 2008, with an account name of "JOHN JACK."  The "Account

POC" name is "JOHN JACK" and the email address is johnjackmy@gmail.com.  The June 26,

2008 incoming transfer can be traced through four e-gold accounts in which the "Account POC"

name is "Xiaoqing Lai" with an email address of y99066@163.com, including e-gold account

number 2033031.  Additionally, one of those four e-gold accounts, 3481672, received two large

transfers of approximately $100,000.00 on April 30, 2008 and approximately $400,000.00 on

May 19, 2008, from OpenBruce accounts 3628018 and 3336586 respectively.  These links

further establish a connection between account number 5251486 and the OpenBruce scheme.  As

of July 16, 2008, account number 5255429 contained 108.368 ounces (approximately

$103,986.47) of e-gold.  This amount represents the proceeds of proceeds of a high yield

investment scheme and/or funds involved in money laundering.

**Clubfreedom**
**e-gold accounts 4575429, 4856092, 4874219, 443390**

61.     Clubfreedom, registered in Hong Kong since September 1, 2006, was advertised

as a multi-level marketing program, which promoted travel rewards and operated on the internet

at http://www.clubfreedom.biz.  Although the website is currently inactive, it can be accessed

through member-created websites such as the examples below.  The scheme involved the sale of

"Access Certificates" for $200, which purportedly allowed a member to book vacations at

wholesale rates.  In actuality, the scheme centered upon a multi-level pyramid scheme in which

members were encouraged to attract and "sponsor" new members.  Since Clubfreedom was an

invitation only program, a potential new member had to be sponsored by a current member.

Member-established websites were created to solicit new members into the Clubfreedom

program in an effort to progress to the top of the pyramid scheme.  Examples of such websites

include: http://www.clubfreedoms.com known as "Pickle Team" and

http://www.clubfreedoms.biz also known as "Pickle Team."  The program required advancement

through several levels, culminating with advancement to the top of the pyramid and generating a

cash reward of $6,000, which could be redeemed in the form of credits through eCash-Invest.

eCash-Invest was touted as a lucrative investment program into which credits gained by the

progression through the various stages/levels would be invested, with an opportunity to earn

monthly commissions.  The advancement cycle could purportedly be continuously repeated,

promising exorbitant returns.  Analysis of the main Clubfreedom operating account, as well as

those under the control and direction of the operators of that account, reveals the bogus that Club

Freedom and eCash-Invest took funds from investors without any attempt at investing in travel options or delivering returns as promised.  The funds were merely laundered among controlled accounts, exchanged out through digital currency exchangers, used to pay scheme contributors, or sent as teaser payments to victims.

**Clubfreedom Main Operating Account - 4437071**

62.     e-gold account number 4437071 was created on May 14, 2007, with account name of "clubfreedom."  The "Account POC" names are Les Richardson and Stefan Gayton, indicating this account is held and operated by these individuals.  The "Account POC" email is listed as gold@clubfreedom.biz.  From March 16, 2007 to September 5, 2007, there were 28,867 deposits into account totaling 8704.44 ounces (approximately $5,772,750) of e-gold.  All of the deposits were in $200.00 increments from various accounts with very similar memo field entries consistent with HYIP activity.  This account was value-limited on July 16, 2007, for "False ID/scammer-k."  The account was frozen on September 5, 2007 pursuant to court order in case number GD 07-018916, which was a civil case filed in Pennsylvania Court of Common Pleas by Michael J. Bruzzese of Bartony & Hare, LLP on September 5, 2007.  After September 5, 2007, there were no further transfers into the account.  Before the freeze order was issued, there were 210 large transfers out of the account from June 11, 2007 to September 3, 2007, totaling 7049.3436 ounces (approximately $4,681,112.58) of e-gold.  On October 2, 2007, the freeze order was vacated by the court.  On October 9, 2007, an administrative memo by e-gold reads, "Remove Freeze for asset turnover: GD 07-018916."  Later on that same date, the value limit for the account is reset for "susp hyip."  In two transactions on October 15, 2007 and October 16, 2007, a total of 1592.4992 ounces (approximately $1,210,000.00) of e-gold were transferred to

e-gold account number 3149682.2  The memo fields indicate "Lawyer Fees" and "For KRG

Lawyers.

63.     Other than the transfers detailed below, most of the other lump sum withdrawals

out of the main operating account 4437071 have the word "Batch" and a number recorded in the

memo field.  All but one of the counter-accounts (the account receiving the transfer) to these

transactions have contact addresses in Lagos, Nigeria and list e-mail addresses with yahoo or g-

mail.  The other account that received approximately $500,000 in transfers appears to be an

exchanger.  Therefore, analysis of the Clubfreedom scheme reveals that none of the funds

deposited by investors into Clubfreedom were being directed to purchase any travel benefits for

Clubfreedom members.

**Account number 4595115**

64.     e-gold account number 4595115 was created on July 11, 2007, with an account

name of "CF Exchange Account."  The "Account POC" name is Les Richardson, with email

addresses of gold@clubfreedom.biz and sales@justit-24-7.com.  From July 11, 2007 to July 15,

2007, this account was funded with four deposits from e-gold account number 4437071 totaling

1206.517382 ounces (approximately $800,000.00) of e-gold.   A value limit was set on the

account on July 16, 2007, for "False ID/scammer-k."  The account was frozen on September 5,

2007, pursuant to court order in case number GD 07-018916 filed by Michael J. Bruzzese of

Bartony & Hare, LLP on September 5, 2007.  On October 2, 2007, the freeze order was vacated

by the court.  On October 9, 2007, an administrative memo by e-gold reads, "Remove Freeze for

asset turnover: GD 07-018916."  On October 16, 2007, a total of 1190.7 ounces (approximately

---

2 The difference between dollar amounts comes from automated "Payee Creator Incentive"
payments from e-gold into the account, which equates to customer referral bonus from e-gold.

$902,548.45) of e-gold were transferred in one transaction to e-gold account number 3149682.[3]
The memo field indicates "For KRG Lawyers."

**Account number 3149682**

65.      e-gold account number 3149682 was created on May, 2 2006, with an account
name of "Les's Account."  The "Account POC" names are Kim, Kim Donald , Kim and Steve
Donald, and Les Richardson (email address for Les Richardson of sales@justit-24-7.com).  This
account was funded primarily by e-gold accounts 4437071 and 4595115 in three transactions.  In
two transactions from account number 4437071, this account received 655.8 ounces
(approximately $500,000.00) of e-gold October 15, 2007, and an additional 936.7 ounces
(approximately $710,000.00) of e-gold on October 16, 2007. Also on October 16, 2007, this
account received 1190.7 ounces (approximately $902,548.45) of e-gold from account number
4595115.  Only minutes after receiving these incoming transfers on their respective dates, a total
of 2769.75 ounces (approximately $2,102,747.04) of e-gold were transferred in two transactions
to account number 4859588.  Account number 3149682 was value-limited on October 19, 2007,
for "susp hyip."

**Account number 4859588**

66.      e-gold account number 4859588 was created on October 16, 2007, with an
account name of "KRG Lawyers."  The "Account POC" name is Ian Richardson, with email
addresses of gold@krg.com.au and sales@justit-24-7.com.  The account was funded with two
deposits from e-gold account number 3149682.  October 15, 2007, this account received 655.3

---

3 The difference between dollar amounts comes from the appreciation in the price of gold from
approximately $666/ounce at the time of the deposits into the account, to $758/ounce upon
transfer out.

ounces (approximately $500,000.00) of e-gold, with a memo field referencing "Lawyer Fees." On October 16, 2007, this account received 2114.4 ounces (approximately $1,602,747.04) of e-gold, with a memo field referencing "For KRG Lawyers."  This account was value-limited on November 11, 2007, for "ROA_funds from susp hyip."  From October 23, 2007 to December 2, 2007, this account transferred a total of 2766.42451 ounces (approximately $2,186,000.00) of e-gold to account number 487746.

**Account number 487746**

67.      e-gold account number 487746 was created on February 23, 2002, with an account name of "Official Game Center."  The "Account POC" names are C.J. Clark, Clinton Clark (with one of two email addresses of [sales@justit-24-7.com](mailto:sales@justit-24-7.com), the same as used by Les Richardson), and Michael Smith.  Analysis of account activity and transaction memo entries indicates that this account was active in the operation of an HYIP in 2002 and 2003.  The account became active once again in 2006 and further in 2007 with transfers from Clubfreedom scheme accounts.  From October 23, 2007 to November 29, 2007, 893.4977 ounces (approximately $718,000.00) of e-gold were transferred into this account from account number 4859588 in nine transactions.  Then, on December 12, 2007, 1872.9 ounces (approximately $1,468,000.00) of e-gold were transferred into this account from account number 4859588 in one transaction.  Thereafter, account number 487746 engaged in a series of transfers out of the account to primarily three e-gold account numbers: 4874219, 4856092 and 4575429.

i.      From October 20, 2007 to November 29, 2007, 490.55 ounces (approximately $382,978.00.00) of e-gold were transferred to account number 4874219.

i.      From October 24, 2007 to January 2, 2008, 794.43 ounces (approximately $653,249.97) of e-gold were transferred to account number 4856092.

i.      On January 3, 2008, account number 487746 was value-limited for

"ROA_RefuseBlocked."  After the limit was placed on the account, 1621.049 ounces

(approximately $1,466,279.41) of e-gold were transferred to account number 4575429 in

twenty-six transactions from January 4, 2008 to February 26, 2008 (and one small

transaction on May 26, 2008).

68.      On around February 21, 2008, the account name for account number 487746 is

changed to "clubfreedom."  Also, on February 21, 2008, and again on May 26, 2008, the

"Account POC" fields were updated.  On one or both of these dates, Les Richardson (email of

sales@justit-24-7.com) was added as an "Account POC."  In all of the transactions into or out of

account number 487746 the memo field varies for each transaction, but it is believed terms such

as "exchange, servers, power back up unit" are used to conceal the movement of HYIP proceeds

from the Clubfreedom scheme.

**Account number 4575429**

69.      e-gold account number 4575429 was created on July 4, 2007, with an account

name of "Cool Dealz."  The "Account POC" name is Vaneet Kaushal.  From January 4, 2008 to

May 26, 2008, this account received 1621.049 ounces (approximately $1,466,279.41) in

proceeds from the HYIP Clubfreedom account number 487746 disguised with memo fields

referencing "power backup unit," "setup server," etc.  This account was accessed by various IP

addresses, which include some of the same IP addresses that controlled the movement of funds

within account 487746.  Transfer of funds out of the account includes payments going to account

numbers 4874219, 4856092 and 4433390 which are also subject to seizure.  As of July 16, 2008,

account number 4575429 contained 228.77608 ounces (approximately $195,283.00) of e-gold.

This amount represents proceeds of a pyramid scheme and/or funds involved in money laundering.

**Account number 4856092**

70.     e-gold account number 4856092 was created on October 14, 2007 with an account name of "Stefan."  The "Account POC" name is Stefan Gayton, who was also a contact for Clubfreedom's primary operating account number 4437071.  From January 4, 2008 to March 3, 2008, 1159.959 ounces (approximately $1,050,000.00) of e-gold were transferred in 14 transactions into this account from account number 4575429.  Also, from October 24 2007 to January 2, 2008, 794.43 ounces (approximately $653,249.97) of e-gold were transferred in transactions into this account from account number 487746.  As of July 16, 2008, account number 4856092 contained 109.1276 ounces (approximately $93,151.35) of e-gold.  This amount represents proceeds of a pyramid scheme and/or funds involved in money laundering..

**Account number 4874219**

71.     e-gold account number 4874219 was created on October 20, 2007, with an account name of "Tatiana's Gold."  The "Account POC" name is Tatiana Richardson at the same address listed in the contact section of other accounts for Les Richardson and Stefan Gayton. From October 20, 2007 to November 29, 2007, 490.55 ounces (approximately $382,978.00.00) of e-gold were transferred into this account from e-gold account number 487746.  From January 28, 2008 to April 4, 2008, this account also received 165.9569 ounces (approximately $151,000.00) of e-gold from account number 4575429.  From October 20, 2007 to February 12, 2008, 306.8892 ounces (approximately $262,867.50) was transferred out to account number 4353453, which appears to be digital currency exchanger.  The vast majority of the transfers

indicate the notation "Exchange Les" in the memo line, further indicating involvement with Les Richardson.  Other transactions include a payment to account 4575429 for 65.803668 ounces (approximately $61,000.00) of e-gold, which is believed to be under the control of Les Richardson and has received Clubfreedom funds as detailed above.  As of July 16, 2008, 93.327684 ounces (approximately $79,664.51) remained in e-gold account number 4874219.  This amount represents proceeds of a pyramid scheme and/or funds involved in money laundering.

**Account number 4433390**

72.     e-gold account number 4433390 was created on May 13, 2007, with an account name of "6k4you."  The "Account POC" name is Les Richardson.  On July 11, 2007, 302 ounces (approximately $200,000.00) of e-gold was transferred from account number 4437071, the main operating account of Clubfreedom, to account number 4433390.  This amount is the only transfer into the account.  On October 9, 2007, a value limit is re-set for "susp hyip."  As of July 16, 2008, account number 4433390 retains 19.53063 ounces (approximately $16,671.35) of e-gold of the July 11, 2007 deposit.  This amount represents proceeds of a pyramid scheme and/or funds involved in money laundering.

**World Pension Plus**
**e-gold accounts 4871774, 2328039, 2841206**

73.     e-gold account numbers 4871774, 2328039, 2841206 are all associated with a fraudulent reverse pension plan scheme called World Pension Plus.  World Pension Plus account activity originated in e-gold account numbers 4624511 and 5188498, which are held in the names of "WPP Accounts Dept" and "WPP2 Accounts Dept.," respectively.  The "Account" "POCs" are listed as "J.Parker" and "Joel Parker".  Both accounts have an e-mail address contact

listed as worldpensionplus@hotmail.com.  The account contact email address, internet research,

account activity and notations in the transaction memo field for these accounts, such as "World

Pension Plus Membership Fee", all indicate that the accounts were used as operating accounts

for World Pension Plus (WPP), a fraudulent high yield investment program.  WPP operates via

the internet at http://www.worldpensionplus.com.  The program promises investors a reverse

pension plan pay out of $80,000 for a one-time registration fee of $55.00 and also paid investors

for referrals.  The scheme claims to operate by providing groups of 20,000 applicants to an

insurance provider. The insurance provider then purportedly takes out a loan from a reputable

financial institution, and borrows 60% of the policy as a payout to program investors.  Analysis

of the account activity for these accounts indicates that World Pension Plus works like a

traditional pyramid scheme, where investors are paid commissions with funds from new

investors.

74.     e-gold account number 4624511 was created on July 22, 2007, and was the first

account used by WPP as an operating account.  On February 14, 2007, account number 4624511

was limited by e-gold Ltd. for "susp hyip," which suggests the account was suspected of being

used by a high yield investment program.  The limit prevented deposits to the account but

allowed transfers.  From November 8, 2007 to February 11, 2007, three days before the limit was

placed on the account, account number 4624511 transferred 277.492351 ounces (approximately

$241,185.72) of e-gold to account 4871774.

75.     e-gold account number 5188498 was created on February 11, 2007, the last day of

account activity in the original WPP operating account number 4624511.  On April 11, 2008,

account number 5188498 was limited by e-gold Ltd. for "susp_hyip-ac". The limit prevented

deposits to the account but allowed transfers.   From February 16, 2007 to April 15, 2007, three days after the limit was placed on this account, account number 4624511 transferred 353.910195 ounces (approximately $330,300.00) in e-gold to account 4871774.

76.     e-gold account number 4871774 was created on October 20, 2007, soon after WPP initially began its fraudulent high yield investment program activities.   The account is held in the name of "Fast Web Gold Acc", and has an account description of Gold Exchanger. However, like the WPP operating accounts, e-gold account number 4871774 has a "POC Account" address in Australia.   In addition, the account activity indicates that all credits to the account are conducted from the WPP operating accounts: 4624511 and 5188498.   As of July 15, 2008, there was 32.228204 ounces (approximately $27,509.99) of e-gold remaining in e-gold account number 4871774.   The funds remaining in account number 4871774 are proceeds of fraudulent high yield investment program and/or are funds involved in money laundering.

77.     A portion of the funds transferred into e-gold account number 4871774 were recently transferred again into e-gold account numbers 2841206 and 2328039.   On March 25, 2008, transfers of 214.132662 ounces (approximately $200,000) of e-gold were made from e-gold account number 4871774 to both e-gold account numbers 2841206 and 2328039.   On April 15, 2008, additional transfers of 73.937891 ounces (approximately $68,570) were made from e-gold account number 4871774 to both e-gold account numbers 2841206 and 2328039.   The funds remaining in account number 2841206 and 2328039 are proceeds of fraudulent high yield investment program and/or are funds involved in money laundering.

**Foreign Fund**
**e-gold account 897312**

78.     e-gold account number 897312 was opened on June 19, 2003 with an account name of "F-B Acc."  The account name, account activity, and notations in the account memo fields, such as "At Foreign-Fund request I spend US$1.00," indicate that this account was the operating account for two related fraudulent high yield investment schemes, Foreign Fund and First Bank.

79.     Foreign Fund was an illegal pyramid scheme which began operating in March 2004 using the e-gold system.  Foreign Fund stated on its website, operated via the internet at http://www.foreign-fund.com, that it was "one of the leading companies specializing in the Foreign Exchange market" and that its traders used currency price fluctuations to make profits for its investors by buying and selling major currencies.  Foreign Fund offered two programs to its investors: Investment in a "non-compounding" account, for which investors could receive up to a 46% monthly return; or investment in a "compounding" account, in which investors could earn up to 100% monthly.  Despite these extraordinary claims, there is no evidence that any of the customer funds have been used for legitimate trading outside of e-gold.  However, account activity in e-gold account number 897312 does indicate that investors were paid interest with payments of later investors, indicative of fraudulent high yield investment schemes.

80.     The Foreign Fund and First Bank e-gold accounts indicated that they were operated by Ron Mealing, who resides in Nashville, Tennessee and John Shirck, who resides in Mountain View, California.  On October 5, 2004, an injunction was issued against Mealing and Shirck by the United States District Court for the Middle District of Tennessee for activity relating to the fraudulent high yield investment programs Foreign Fund and First Bank.

81.     In February 2004, the operators of Foreign Fund created an "online bank" at
http://www.ff-bank.com, called First Bank, to continue operating their Ponzi scheme.  The e-
gold account used to operate the First Bank scam was account number 897312.

82.     e-gold account number 897312 had a total 1176 deposits into the account.  The
total weight transferred into the e-gold account from the high yield investment schemes was
425.221942 ounces (approximately $170,319.67) in e-gold.  There were also 27 total withdraws
out of the account with a total weight transfer of 276.273647 ounces (approximately
$112,119.29) of e-gold.  The balance in the account has been stagnant since May 2004.  As of
July 16, 2008, a balance of 142.079184 ounces (approximately $121,278.79) of e-gold remains
in the account.

## 5Dimes
## e-gold account 2043340

83.     e-gold account number 2043340 was created on April 12, 2005 in the name of
"5Dimes."  The "Account POC" names are listed as both Tony Williams and Mary Carvajal with
addresses in San Jose, Costa Rica and Gingerland, Nevis.  5Dimes is an online gambling website
which is operated on the internet at http://www.5dimes.com.  The site offers the visitor the
ability to gamble on football, baseball, basketball, golf, boxing, hockey, soccer, auto racing,
tennis and others.  The site indicates that the company is operated out of San Jose, Costa Rica
and offers 24-hour customer support.  A bettor may fund his or her betting account with an
electric check, Western Union, e-gold, eWalletexpress, wire transfers, or by phone.  The entire
site is presented in English, suggesting that the target market is not Central or South America.

84.     United States citizens are not restricted by 5Dimes from participating in the
betting activities offered on their website.  In fact, when signing up to open an account, the

United States is the default country.  In addition, all wagers and payments are based in U.S. dollars and 5Dimes provides multiple 1-800 numbers for toll-free calling to the website operators from within the United States.  Analysis of this account reveals that the account owners have accessed the account using an IP address registered to an internet provider in Arizona and in Texas.  Additionally, many of the IP addresses accessed by customers to send funds to 5Dimes are also located within the United States.

85.    From April 20, 2005 to July 16, 2008, there were 2,269 deposits into account number 2043340 for a total of 855.968348 ounces (approximately $543,205.27) of e-gold.  The deposits contain memo field entries like "5 dimes," "for wagering purpose," and "fund my account 5D1821717."  From April 23, 2005 to July 15, 2008, there were 831 transactions out of the account totaling 703.01391 ounces (approximately $438,707.26) of e-gold.  The withdrawals contain memo field entries like "5Dimes redemption," "5Dimes Payout," and "5 Dimes Payment."  The account was limited by e-gold for "False ID" on December 4, 2007.  As of July 16, 2008, the account balance was 187.725225 ounces (approximately $160,242.25) of e-gold. This amount represents proceeds of illegal online gambling and/or funds involved in money laundering.

86.    I am advised that 18 U.S.C. § 981(b)(3), provides that "a seizure warrant may be issued . . . by a judicial officer in any district in which a forfeiture action against the property may be filed under Section 1355(b) of Title 28, and may be executed in any district in which the property is found . . . ."  Accordingly, this District Court may issue and cause to be served in any other district the requested seizure warrant.

_____

Ryan Eggland
Special Agent, Internal Revenue Service


Subscribed and sworn to before me this _____ day of August, 2008,


_____
United States District Judge
District of Columbia